I'd like to thank the Court for accommodating my schedule and rescheduling the argument. I appreciate that very much. Obviously, we've raised many issues in the briefs, and I'm not going to speak about all of them. I wanted to focus on a few issues. First, I wanted to say something about the sufficiency of the evidence issue. In particular, what I wanted to focus on is why we think this case is really indistinguishable from United States v. Price and the other two cases that we have cited, Weir and Rasparian, in the sense that both of those cases deal with situations where the intent was the issue, as it was in this case, knowledge of the fraudulent enterprise and intent. The government's response to our citation to United States v. Price is that there was evidence that Ms. Kohiki was a manager and had some much more intimate relationship to this enterprise. Wasn't there some indication or testimony that she also, at one point, had sole control of the mail room? There was some testimony that she was in charge of the mail room, but of course the way that this fraud went down was that the cards were actually supposed to be coming from another place, from the banks themselves. So the card wouldn't be sent to the mail room? Right. It would go to the applicant, presumably? Right. Obviously, there would be complaints, but everybody there knew about complaints. And all the other witnesses, none of the other witnesses who were there for a period of time said, you know, we really knew that this was a fraudulent enterprise. They were all taken in by Mr. Sarabia as well. What about the testimony that she was actually schooling some of the employees, the telemarketers, in the script? Well, but that doesn't show that she knew that it was a fraudulent enterprise. It shows that she thought it was an appropriate enterprise. But don't we have to view the evidence in the totality and then with the presumption since the jury convicted in the light most favorable to the government? Yeah, but I think that the point is that cases like Price, I mean, in Price, the wife actually knowingly sent a fraudulent letter to someone and made fraudulent representations about which there is no evidence in this record with respect to Ms. Kohiki. Except that she signed the lease, right, and changed her name? Well, no. I mean, the testimony there is that the lease was prepared for her, and it was in a name that had a slightly different spelling, and she signed it. She actually gave information that had her real name on it. So if she was trying to defraud anybody, why would she do that? So I guess your response to my questioning is we don't dispute the fact that she worked there, but that in and of itself is not enough. Right, and, in fact, I think the line of cases with Price say that there has to be something more than just being part of a place that winds up being a criminal enterprise. I mean, these are all relative cases, right? And in our case, you've got someone who's in a failed love relationship with the main operator. What about the cash in her bank account? She got cash from her mother. There's no dispute that she got cash from her mother. There's none. There's no evidence of murder. She got $13,300. She says that she gave more than $20 to the enterprise, and after there's a breakup with Mr. Sarabia, about which there's lots of testimony from everybody, she demanded some of her money back, and she got it. I thought I was reading some discussion about the fact that there were some checks, cash that the IRS That's not by her. That's by Ms. Alvarado. No, I understand that. But then large sums of money show up contemporaneously in Ms. Gohicke's bank account. Yeah, but she explained that. I mean, you know, there's no testimony. Mr. Hoffman, let me finish my question. The concern I have is that, yes, the defense had an explanation for it, but the jury returned a verdict of guilty, and so we must draw the inferences not in favor of Ms. Gohicke, but consistent with the government's theory of the case. But the inferences have to be justified. And the fact that money appears in Ms. Gohicke's bank account at a time when she and her mother testified that money was given there and there is no evidence that money came from the fraudulent scheme to that bank account other than the $13,300 that's there in the testimony in October doesn't mean that she had a knowledge that this was a fraudulent thing. In fact, if you've got money, that's not evidence that you know it's a fraud. You can get money from a perfectly legitimate enterprise. Again, I would agree with you in isolation, but don't we have to look at the totality of all the pieces of evidence and then ask whether or not that is sufficient? And what I'm saying to you is that under the line of cases starting with Price, it isn't. And I think if you look at the criteria that this Court has used in U.S. v. Price, I think you would find that this case is indistinguishable from that in terms of that. But maybe I should move on because what I'd like to focus on next really is the which I think is the heart of the problem and the unfairness in this case is the way that Judge Reel handled this trial. And obviously when there are allegations as serious as the ones in this case, the Court has generally, speaking, reviewed the whole record and we understand that that would be something that the Court would do. What I want to focus on is three particular things. The first particular thing is the outrageous question to Ms. Kohiki at the end of her testimony, asking her to say whether another witness was lying on a very, very important question. Okay. I'll agree with you that that was error. The question is does the curative instruction that he gave the next morning to the jury, is that sufficient? Well, that's what the government says. I say that this is one of those cases where this is a bell that simply cannot be unrung. So there's no curative instruction. The only thing that could be done in that case would be to declare a misdemeanor. And it was asked for mistrust. And the reason, and I think that one has to, this is not just a minor little error. I mean, Judge Reel has been on the bench for 30 years. There is a line of cases across this country that you can't ask this question. He asked it three times over objection by counsel. Now, he's not a new prosecutor. He's not somebody that doesn't know exactly what he's doing. What he's doing is saying to the jury, she is guilty. Don't believe her. Believe the other person. And then he dismisses them and says exactly that. Says that that's what's happening. If someone says in my courtroom that, you know, this, that they're lying. So it wasn't that he didn't know about it. He knew exactly what he was doing. He did it. Then he let the jury sit on it overnight. He didn't have a juror and instructive right then. He didn't say, as anybody, he knew that he had behaved improperly. Anybody would know that that's an improper question. He let them stew. He let it sink in. And the next morning he says, you know, I asked a bad question yesterday, and I'm really sorry for that. So basically what he was saying the next morning was, you know, I told you that Ms. Kohiki was lying yesterday through my questioning. And at what point in the trial did this occur? How many days into this? That's in the defense's case. So what's going to put an end to the trial? Yeah. But one can't excuse a judge who's been on the bench as long as it's real from engaging in this kind of – I mean, this is the kind of error that a prosecutor presumably would be reviewed for misconduct. It's the most severe kind of error you can have. And it's not like there's any – Well, I can think of some worse. Well, there are some cases that are worse. Yeah, exactly. But this is a very severe error, one which I don't think anyone could recover from because she was on the stand and her credibility was crucial about – and it goes to the sufficiency point. I mean, this was a close case. The jury didn't buy most of the government's case. They bought a little part of the case for one small period of time. And they bought an aiding and abetting theory. It had to be because she obviously didn't get convicted on anything where she was convicted of being a co-scammer. So this was something that really tilted the balance unfairly, knowingly against her. Was she convicted on – for any of the counts that that witness testified to? The one that – Yes. The one that – That Pacific Bank. Yeah. Okay. This is Yara or Lara? Her name is Yara Lee Lara is the name of the witness. The one who said that Kohiki told her to do the rebuttal the next time? Right, right, right. When – and just to go back to what Judge Tallman was asking about the context. When did Kohiki come on the stand in relation to when this – when these witnesses who were her coworkers or the co-employees – I don't remember the particular days. I mean, I think that there was a lot of – How long was the trial? I think it was seven or eight days altogether of trial days. And this is towards the end of the trial. So how much gap was there between the three? I'd have to check. I think it's two or three days. But I have to check that, Your Honor. The – if I – Go ahead. Is there more? I'd like to move to another point on this. The cross-examination of Ms. – So I just want to wrap up this. You think just the fact that Judge Real committed the error of asking that question and that is in and of itself regardless of anything else. Yes. If it had been an otherwise perfect trial, that would have been – and I realize you don't think it was an otherwise perfect trial. Right. But that alone would be sufficient. Yes. Okay. And the closest case you have, aside from the 28-J letter you submitted, anything else? No. That's it?  So if we were to adopt your rule, we would – and publish an opinion, then the standard in this circuit would be if a judge asks that improper question, that that's an automatic mistrial. Well, I think that – no, not exactly that. I think that in the context of a trial in which the evidence was as close as it was. In other words, I think that where a – this is a case where the judge is asking of the defendant in the case about an important issue in the trial, a completely improper question that basically goes to the very credibility of her testimony. I think if a judge asks that question on something that's tangential in another context, I'm not saying that merely by asking that question per se. I'm saying in the context of this – of the importance of this question and the way that it was done and her testimony and the closeness of the evidence, I think it would satisfy any standard of reversible error that the court would apply to it is what I'm saying, really. Okay. And I think it's – as you know, we don't think it was an otherwise perfect trial. And the next point that I'm going to make on the judicial misconduct front is the cross-examination of Ms. Kohiki's mother by Judge Reel. And again, I mean, this is a situation where I think you have to put in context Judge Reel's experience and knowledge and what he did here. The government cross-examined for basically two pages in the transcript on Ms. Kohiki. The judge at the end of that then cross-examines for three pages. And it's not just clarifying questions. He's right off the bat asking questions about, you know, did you register the $9,000 with the coming of the – now, he knows that's a completely absurd question. Everybody knows that it's $10,000. Now, it's true that the witness, of course, says that. But how does the jury know that that's not – I mean, he's communicating to the jury that there's something wrong with the way this happened because what he's communicating is that it's a lie. That's what he's trying to get the jury to believe. And he uses an advocate's technique to ask an improper question to which, you know, he would never allow anybody to ask, but he asked it. And then at the end of it, he asks about whether Ms. Kohiki knows the name of the company that her daughter works for. Now, that's a fair question. But at the end of it, he says, you do not know now the name of the company that she was working in 2000? Is that what you're trying to tell us? So he ends his examination, as he began it, showing disdain for a witness that was very important to the defense case. And so he was behaving as an advocate, not as a neutral participant. And we're not saying you can't ask questions. But I think when the questions make you an advocate, that's where you cross the line. And the other point that we made about Mr. Cohen in closing argument, he tells the jury that Mr. Barry Cohen, one of the co-schemers, is unavailable to testify, when he knows because he signed the cooperation agreement that Mr. Cohen is available to testify. And that's not just a little mistake. Because the lawyer, Mr. Sarabia's lawyer, comes back and says, but there's a cooperation agreement. He shuts them off. Now, that's the kind of error that if a prosecutor did it, it would be the kind of thing that there would be a opinion from the Ninth Circuit, as there is in United States v. Kojain, which is fairly similar, where the prosecutor in the U.S. Attorney's Office is castigated for doing that kind of thing. And Judge Reel does it blatantly over objection. And I'd like to reserve some time for rebuttal. So the one last thing I would say, if I could, is to say that with respect to the Brady violation in the case that we've alleged, the violation of not communicating to the defense that John Sarabia had said that Ms. Kohiki did not have anything to do with the fraudulent, didn't know about the fraud involved in this situation. There, this Court runs up against the clearly erroneous issue, and the government is saying you can't change Judge Reel's decision that that was never said, and therefore there was no Brady violation. And I would just suggest to the Court that I think the Court can find that that's a clearly erroneous finding. And the reason I would say that is that this is an interview that takes place approximately a month before this trial of an alleged co-schemer that's entered into a cooperation agreement. Clearly the government's going to ask about Kohiki's knowledge. They're about to try Ms. Kohiki. And Mr. Sarabia testifies that he said that she wasn't involved. But even more important, Ms. Foch, one of the agents, says she was directed by Ms. Villareal not to transcribe the interview. And then there's testimony from Mr. Gabbard that Ms. Villareal calls him right after this interview and says, your client has basically violated the cooperation agreement by giving exculpatory evidence about Ms. Kohiki. Now, Judge Reel doesn't take into account Mr. Gabbard's testimony. Mr. Gabbard has no reason to lie, neither does Mr. Sarabia. It's against his interest. Whereas Ms. Villareal and Ms. Foch have lots of reasons to uphold this conviction. And there's absolutely no mention of that. And it just – if you look at this evidence, I think it's just another example of Judge Reel doing whatever he needed to do to convict Ms. Kohiki. Let me direct your attention to Rule 614B of the Federal Rules of Evidence, which says the court may interrogate witnesses, whether called by itself or by a party. That rule, as it is written, seems to permit the judge to – it uses the word interrogate. It doesn't say may ask questions. By what standard of review do we apply under that rule the determination of whether or not the judge's interrogation, as the rule permits, has gone too far? Well, I think that the court has to decide whether the court has fairly interrogated or has become – has gone to the point where there's an appearance of impropriety and has taken a side in the case. I mean, that's what I think this court has defined under that rule. And under the cases that we've cited. So would it be an abuse of the trial judge's discretion? I think so. Okay. I'd like to save the rest of my time. Good afternoon, Your Honor. Good afternoon, Your Honor. Brian Hirschman on behalf of the United States. I would like to address some of the answers to some of the court's questions and to address a couple of what I believe are inaccuracies on what opposing counsel has said. And then I'd like to turn to the prosecutorial. With respect to when Yamile Lora testified, that was on day three of the trial. You can find that at GER 110. That was April 17th. The question at the end of the day occurred on April 21. And the curative instruction occurred on the next morning, April 22. With respect to defense counsel's claim that none of the witnesses testified that they knew that it was a fraudulent enterprise. That simply isn't accurate. In fact, there were four witnesses during the trial, three of them 16 years old, who testified that they quit this enterprise because they had suspicions that this was a fraudulent enterprise. That's Colleen Glab. That's Daniel Aguirre. That's Ryan Bernal. And that is Nicholas Niven. And you can find those in the record at GER 44, 92-94, 108-109, 122-125. In fact, Ryan Bernal and his friends started at the very beginning of the operation with defendants when it was just basically them and Leo Sarabia. Within a week, they both quit because they realized that this was a fraudulent operation. In fact, credit cards weren't being sent out. It's important to consider in the context here, defendant juxtaposed versus those 16-year-old kids who were on the phone telemarketing. Defendant played a supervisory role. She managed the mailroom. She trained the employees. She was familiar with the script in that she role-played with Leo Sarabia on that script with one of the telemarketers. That was testified to. She retrieved and opened the mail with customer complaints. The testimony at trial was that there were some hundreds of complaints from the Better Business Bureau that came into the mailroom during the time where defendant was supervising the mailroom to say that she wouldn't have been aware of those customer complaints. And I think Judge Tomlin made an excellent point, and that is that you have to assume that the inference are in favor of the government, in this case, because of the jury's verdict. And if any rational trial fact could have found the elements of the crime beyond a reasonable doubt, having those inferences in favor of the government, then the verdict must be affirmed. But I would like to address. There certainly is a lot of what she did that has an innocent enough explanation. So I guess the question is, do we go strictly on the inferences in favor of the jury, or we're allowed to look at, for example, on the money aspect that counsel argued? Yes, her mother came in and testified what the money was. What was it that linked her to? What does the evidence of the money in her bank account go to? Well, there's a variety of evidence, and it's not just the money in the account. Realize she did get 13,300 checks. Realize that the testimony from numerous witnesses was that she was a partner and a vice president and an investor in this operation. It's logical that an investor is going to be getting income back. The evidence was that throughout the time period where the fraudulent enterprise was in place, cash was coming into the business, and it would later be seen almost instantaneously into the defendant's bank account. How does that prove that you know she's involved in a fraud? Well, it is one of a variety of factors. It goes to whether someone is in a management position, whether they're a partner, an investor in the business, which makes them more likely to be aware of the nature of the operation. I would submit that it probably is a lesser factor than perhaps some of the others, like the fact that she was forging physicians' names on letters, the fact that she would listen to the messages with customer complaints, and Leo Saravia would immediately delete those messages. There are numerous instances. The fact that she told a witness just to use rebuttals next time. The list goes on and on from the testimony of the employees who were there on a day-to-day basis of defendant-specific involvement and knowledge of what was occurring, and the jury was entitled to use those reasonable inferences to determine that she was guilty of the crime that was charged. Remember, in comparing her to a number of the 16-year-old witnesses who quit because they themselves, who didn't have the education, who weren't in a supervisorial position, figured out that this was a fraud. Remember, she's also in the mail room. When you say they didn't have her education, what was her education at that point? She had a college education at that point with a number of degrees in accounting and business. Remember that she also told Deloitte & Touche that her responsibilities in this business were to develop the marketing plan to supervise 20 subordinates. She testified at trial that she was lying to Deloitte & Touche when she made those representations. Now, a jury is going to consider that in determining whether or not she's now telling the truth when she said she didn't know about the fraud. I would like to deal with the prosecutorial misconduct issue, and I think it's important to establish a timeline for what occurred. John Sarabia was interviewed on four occasions by the government. The first was March 5, 2002. The memorandum of interview was produced with respect to that interview. Again, on March 15, 2002, John Sarabia was interviewed. At that time, he testified that to his knowledge, or he informed the government, that the defendant was a partner in the business. She was in the office every day working on leads and the computer mailing information. He said she did not think defendant-supervised employees made calls for Pacific Bank Com or handled complaints. Remember, John Sarabia works at Nissan Bank Corp. The employee witnesses who testified work with defendants on a day-to-day basis. They're at Pacific Bank Com. So it's not surprising that, to some degree, John Sarabia doesn't know that much about what Sanai Kohiki is doing on a day-to-day basis. Again, the defendant was interviewed on April 1, 2002. The notes of that interview were produced. He again says the defendant was a partner. She worked in reception area with an earshot of the telemarketers, worked on a day-to-day basis, working on the computers. He said he personally did not speak with defendant. This is turned over. He did not speak with defendant. He did not see her talk on the phone or open the mail. He did not attend any meetings with her and Leo Sarabia. He did not discuss Pacific Bank Com with her. And then John Sarabia says in that interview, but it was likely she knew what was going on because she worked there full-time. It was likely she knew what was going on because she worked there full-time. Those notes and that memorandum of interviews produced. You can find all this, by the way, the summary at GER 378 to 379, and the memorandum of interviews are at GER 410 to 429. Then, just before trial, a fourth interview of John Sarabia occurs. It's on March 17, 2003. This was trial preparation. And those notes weren't produced because there was no new information provided at that meeting. Essentially, John Sarabia reiterated what he had said during his previous three interviews. Those memorandum of interviews were turned over. He said, I really don't know much about Sinai or what she did at Pacific Bank Com. After that comment, then it's specifically, well, what do you know and what don't you know? Well, here's what I do know. I didn't discuss Pacific Bank Com with defendant, so I don't really know. But I knew that she was a partner and that she invested. I knew that she kept track of leads, worked on computers, put packages together for clients. At no time during any of these four meetings, and the record is entirely clear on this, did defendant ever say the defendant knew nothing about the fraud. In fact, John Sarabia testified that he didn't make such a statement. John Sarabia's testimony was that, according to him, what he told the prosecutor were, I felt that Sinai didn't have a lot of knowledge about the business. That's what his quote was. Keep in context that that statement is rejected by the district court. In a finding where John Sarabia testified, where the declaration of the prosecutor is submitted, and where the agent is testified and subject to cross-examination, the court listens to the testimony and says, that statement was not made by John Sarabia. I agree with the prosecutor and with the agent. The statement made by John Sarabia was essentially that he didn't know much about Sinai Kohiki, which is consistent with everything that has been said and produced in the previous three interviews. In any event, even assuming for a moment that he said John Sarabia didn't know about the fraud, there's no evidence that that occurred. That's just a statement from defense counsel as to what he said. What did he plead guilty to in his cooperation agreement? He pled guilty to a tax fraud violation, I believe. Not anything connected with the credit card scam? No. He did not plead – well, yes and no. In his plea agreement, basically in the factual basis, he discusses the fact that he was involved in a fraudulent operation. He states in that that the court can consider his involvement in the fraud in determining where within the guidelines it is and whether an upward departure is appropriate. But he specifically does not plead guilty to a 1341 or a 1343, a mail fraud or a wire fraud charge. But if you then look at – let's assume for a moment that what he said was she didn't know about the fraud. John Sarabia cannot testify to that anyway. Under Whitworth and Kupow, the witness's belief – and he hasn't spoken to her about it, he says that, so it's just his speculation about what she did or did not know – is not admissible in any event. He could not take the stand and testify, I believe she didn't know about it. He has no reason to know one way or another what is in her state of mind. So it's not a material statement. It's not exculpatory. All right. And I would now like to move on to the error of the court in commenting on – in asking the defendant the question which occurred on the end of April 21. Excuse me. What was John Sarabia's role in all of this? John Sarabia was a co-schemer. He basically ran the Nissan Bank Corp. part of the operation. There were three entities. There was Pacific Bank Corp., Nissan Bank Corp., and Universal Bank Corp. Defendant Sanai Kohiki was involved in Pacific Bank Corp. She was convicted of those charges and those charges alone. John Sarabia ran Nissan Bank Corp., which was a similar entity doing the same thing but in a different location with different employees, although there was some overlap with the employees. And Universal Bank Corp. was the third entity that starts basically towards the end of the operation and after the other two get shut down. And that's mostly Leo Sarabia and, to some degree, John Sarabia. So there are three separate entities involved. But, remember, on a day-to-day basis, John – I'm trying to reconcile her status as a partner and his limited impression of what she knows. If she's a partner, he seems woefully uninformed about her partnership role. Right, and that is because of the structure that was set up, essentially. She's a partner in Pacific Bank Corp. There's no evidence that she had any financial interest in Nissan Bank Corp. In fact, there's little money that the government could trace with respect to – from Pacific Bank Corp. to Nissan Bank Corp. through Leo, John Sarabia, and Barry Cohen. But, essentially, each of them had their own income, their own victims, their own fraudulent operations. Could you go ahead? At some point, are you going to get to the judicial misconduct? I am, and I would like to move to that now. And I think it's wrong for defense counsel to assert, essentially, that this is some kind of car baby, that once the words come out of the court's mouth, that at that point in time, the only remedy is a mistrial. There is no reported case from any circuit that I'm aware of that holds that that is the standard. In fact, this case can be distinguished from each of the cases in which the court found that it was reversible error. And, in fact, there are several reported cases where the court found that it was harmless error. And if this kind of statement were such that it would be an automatic reversal, then you wouldn't even do the harmless error analysis that the courts have engaged in. But let's look specifically at some of the distinctions between the current case and those published opinions. What about Combs that just came down? Yes. And there are several important distinctions between this case and Combs. The most important, which distinguishes this case from all the published cases, is in none of those published cases was there a curative instruction. Immediately the next morning, the very first thing, which is immediately after the question has been asked, contemporaneously, I realize it's the next morning, the court says, I apologize. It was improper for me to ask that question. It is within the jury's exclusive obligation and duty to find the credibility of the witnesses. That's at ER 221. Essentially, no other reported case has the court apologizing to the jury, providing a curative instruction, explaining to the jury that it is within sole province of the jury to determine the credibility. That distinguishes this case from the Combs case. There are other distinguishing factors. In the Combs case, it was essentially a situation where it was one agent's testimony versus the defendant. And the question was, has to do with the defendant's contradiction of what the agent said. This question, in particular, had to do with one of a dozen employee witnesses who testified and contradicted what defendants said. Well, but that's sort of not quite the point, is it? I mean, she is the one, and it's her credibility as to what she has to say to this jury that's going to make or break her defense. And if the judge does something that basically conveys the impression that he thinks she's lying, that's pretty powerful, isn't it? Well, I think, though, you do have to look at the nature of the question. Again, the jury has already heard the testimony, for example, of Yamile Lor and each of the witnesses. Well, that's right. But the issue is, what is the judge doing impugning the veracity of the witness on the stand who is the defendant, whose credibility is going to make or break whether she's convicted? Well, I don't dispute that it was error for the court to have asked that question. But then you have to move on to the harmless error analysis here. And in determining the harmless error analysis, you have to look at the nature of the question asked, what it related to, and how significant it was in the trial. And in that, it's important to realize that this is one of a dozen employee witnesses. The jury is smart enough to know that there is a contradiction at this point between the testimony of the defendant and the witness. That's weighing witness against witness, okay? We're now weighing witness against the judge, defendant against the judge. Right. Now the judge has taken on the role of a prosecutor and essentially conveyed through his question that he thinks that the defendant is a liar. I don't – I think in asking the question, are you saying this person is lying, the judge isn't saying, I believe this person is lying. The question is what the question is. Are you saying that this other witness was lying, comparing the defendant's testimony to this other witness? One of them must be lying because they are in direct contradiction. In fact, the defendant was in direct contradiction with more than a dozen employee witnesses who testified about witness error. What's improper about the question? The question is that you can't ask one witness to comment. It's my understanding from Geston and Combs and Sanchez-Limas, you can't ask one witness to comment about the credibility of another witness. Why? Because that is for the sole province of the jury. The jury is the one who determines whether someone is lying or not lying, and it's improper for one witness to be asked whether or not another witness is lying. Essentially, it's a fine line. You can ask, do you dispute what this person said? But that's as far as you can go. You can't then ask, do you say that they are lying, because then you're asking this witness to comment on the credibility of another witness, and that's improper. But that's really, as I understand it, as far as it goes. The question is, was the defendant making a credibility call about another witness, and she shouldn't have been doing that. But in comparing, again, Combs to the current case, I think you have to also keep in mind that in Combs, the prosecutor, not only was there no curative instruction, but the prosecutor revived the error in closing argument and vouched for the credibility of the agent. In other words, the court found that that enhanced the error. It made it more significant in the minds of the jury. That distinguishes the present case where essentially once that question was asked, there was an apology. There was a reaffirmation of an instruction given throughout the trial, which was that it is for the sole determination of the jury to determine whether or not a witness is credible or whether or not a witness is lying. And I think that's an important distinction. And I'd also cite to both the Sullivan and Boyd case where the court found essentially for what I'm suggesting, which is that, yes, it is wrong to ask that question, but the jury already heard the fact that this witness testified this way and this witness testified this way. It's essentially a rhetorical question to ask, are you saying that person is lying? And therefore, in a harmless error analysis, that question in and of itself is not a basis to reverse. And specifically, the Sullivan case out of the First Circuit makes that exact distinction where it says, you know, pointing out the differences is essentially rhetorical, which is essentially what was done here. And again, we're talking about pointing out the difference from one witness of a dozen employee witnesses and the defendant's own testimony. I would like to move on to the other allegations with respect to, for example, questioning defendant's mother. And the record shows that there were a total of 12 questions asked to defendant's mother. And as this court pointed out, Federal Rule of Evidence 614B specifically allows the court to ask questions of witnesses. The questions were open-ended. They were not accusatory. They were not, as it turns out, particularly proven. Well, the question of how did you report the $9,000 comes pretty close to suggesting that she may have been smuggling currency. Although the witness's response was right on the money and directly contradictory. She says, I'm aware of the law. The law is I only have to report more than $9,000. That's why I brought $9,000. Well, that's the testimony. So now he's accusing her of structuring? No. Okay. Well, I think that is a reading that isn't from the record. Essentially, what the court asked a question, and she clarified that her knowledge of the law was she only had to report $9,000. But we're talking about a small number of questions, relatively confined, open-ended questions that, given the standard of plain error that applies here, would not justify reversing a jury verdict after two weeks of testimony from numerous witnesses about whether or not the defendant was involved in a fraudulent enterprise. With respect to the comment about Barry Cohen's availability to testify, which occurred in the closing argument of co-defendant's counsel. Remember, this isn't the closing argument of defendant's counsel. It's in another counsel's closing argument. It's important to have the concept of what Barry Cohen would have testified to if he had testified. Remember from the memorandum of interviews, he would have inculpated defendant. Defendant made absolutely no effort to call Barry Cohen at trial. There was no effort to call either John Saravia or Barry Cohen at trial. The government did not receive a subpoena for either. Kennedy. Was there a little gamesmanship going on about scheduling Cohen's trial? There was not, Your Honor. So that he wouldn't get on the stand and say anything helpful to Kodaki? I believe that it is a pretty routine policy of the government that when someone is cooperating, they're sentencing. Unfortunately, I think you're right about that. There is a policy. There is a practice of keeping, of programming these witnesses to appear when it's convenient for the government. Well, I think the purpose in continuing a sentencing, for example, is if a person, if a witness who's cooperating is going to testify on behalf of the government, then that person should get the benefit of that cooperation in the form of a 5K1.1 recommendation. And so if Barry Cohen were required to testify at trial, or any other cooperating witness is required to testify at trial, that person is generally entitled to more, in terms of a 5K1.1 recommendation from the government, than if they don't testify at trial. And that's the reason, and I believe it's an innocuous one, for the practice of continuing a sentencing until after a trial of a co-schemer so that if the person is called to testify, he's. Well, we're running. We're running past your time. And the Cohen thing is probably not what this case is going to turn on. But what about the efficacy of that remedial instruction? It sounded pretty broad and general and vague. It's almost like campaign oratory. Your Honor, I think because, remember that I went back and looked at the record. There were exactly two questions that the court asked to Defendant Sanai Kohiki over the course of the direct and the cross-examination. Two questions. The first one occurs on, and I made a note of this, but let me just go to the record if I may. GER 287, where the court asks, did you get any money for your services? The next question, the one at issue, is the one about you saying that other witnesses are lying. And that occurs at ER 214 and 215. So when the court apologizes and says, that question I asked was improper and I apologize to you, there can be no rational expectation except that he's referring to the specific question he asked where he said, are you saying that that witness is lying? Because he follows that up with, it is the exclusive obligation and duty. And that's the question. Of course, there was an overnight recess. Then the next morning, I'm not sure if I were a juror, I would know what question he was apologizing about. Except there was a heated exchange around that question at the time. Defense counsel. Well, there was an objection and it was overruled. There were several objections, I think, and it was a rather heated exchange in terms of the objections. I think that the record would work better. Well, I think one of the things about the environment of that trial was that there were more than one heated exchange in the four or five days that this went on. I do. I do understand that. He's an equal opportunity scolder. Yeah. He yells at the government. But the point is that in this particular exchange, it happens at the very end of the day. There's no additional questions after that. The very next morning, and it's significant for Judge Reel to get up to the jury and say, I apologize for what I've done. The question I asked was improper. It is only for you and only you to determine the credibility of the witness after that heated exchange at the end of the day that had to do with whether or not another witness was lying or whether or not the defendant believed another witness was lying. I think from the record, it's clear. I think we have. I think we have. Let me just ask one clarification question. Yes. Was that, was the phrasing of what Judge Reel said the subject of any on-the-record colloquy outside the presence of the jury after the jury was removed from the courtroom that afternoon or before court began the next morning? Before court began the next morning, the government submitted the Geston case and the Sanchez-Lima case to the court. There was no further colloquy that afternoon. When Judge Reel leaves the bench, he was gone for the day. The next morning before the jury came in, the court submitted, the government submitted those cases to the court. There was then the colloquy the next morning outside the presence of the jury where it was discussed that it was, the question was improper. And then Judge Reel took the bench, apologized for the question, and gave the curative instruction that he gave. So the answer to Judge Goodwin's question was that Judge Reel decided upon the context, or excuse me, the language, tenor, whatever you want to call it, of the phrasing that it wasn't language that counsel had agreed he would give. That is correct. All right. Thank you. I don't want to charge, take any more time, but the Blakeley, it's no surprise to the government that the Blakeley case came down after you'd already briefed most of this case. I think there is a passing reference to the sentence in the reply brief, but the does the government have a position on whether this case needs to be remanded for consideration of the sentence under? The government's first position is that since it was raised in the reply, it's a late-raise claim. But assuming that the Blakeley issue is raised, the government would ask that the court postpone ruling until we get a decision from the Supreme Court on Blakeley. If the Supreme Court's ruling is essentially consistent with the current Amaline opinion, then I don't think there's any doubt that it would need to be remanded for sentencing because the government did not present, have the jury find the enhancements beyond a reasonable doubt. So the government's position would be either that it has been waived or if not, that we postpone the ruling. But if the ruling is consistent with Amaline from the Supreme Court, then I think the answer is Blakeley. Okay. Thank you. I appreciate your answer on that. Thank you. Okay. Mr. Hoffman? Thank you. I just have a few brief points. The first one about judicial misconduct. I think that the big point that counsel is missing in terms of the other cases, this was a judge. The other cases involve prosecutors and lawyers. As far as I know, this is the only case in this line of cases that involves a judge asking this question, which I think transforms the error into something much worse and much more dramatic. Of course, we still permit, do we not, although it's an anomaly in federal law, the court may comment upon the evidence. He could, if he wanted to, in charging the jury, actually make observations as to what evidence they should consider and what evidence they should discount. Whatever a court should do in that context, the court clearly can't. I mean, I think everybody agrees that what he did was error and that the line of cases prohibits it. What I heard you saying is that it's a more egregious violation because it's a judge, whereas those other cases dealt with lawyers. I'm trying to square that with the federal law. We've actually cited a case where a case was reversed where the judge made a comment indicating the guilt of the defendant, and that was reversed by this circuit many years ago. And so I don't think there are limits. That would be the other judge, Goodwin, right? We don't want to say. I was not actually going to mention the district court judge in that case. He's well known to us. There is that case, and I think that there are limits that this circuit has placed on that. And I don't think that a jury would take this admonition as meaning anything that was useful to eliminate this. I mean, he should have. I don't think there's anything he could have done, really, to eliminate the harm. On prosecutorial misconduct, counsel does not really still deal with the Gabbard Declaration. Why is it that the prosecutor in this case, after this interview, calls up the lawyer for Mr. Sarabia and says, you've blown the cooperation agreement because you've given information that's exculpatory, and that never gets to defense counsel? And it seems to me that is the huge thing that Judge Reel didn't deal with, as to which there's absolutely no reason why Mr. Gabbard, who's a distinguished practitioner in this court, would lie about the fact that the prosecutor in this case said that that had happened, and yet that's not turned over to the defense. On sufficiency, there are two points I want to make on that. One is that the fact that people who are workers, particularly 16-year-olds, call somebody a partner, Mr. Sarabia's wife, vice president. Well, she called herself. She herself sort of elevated her status in her Deloitte Touche. Well, it could be that she committed resume fraud with Deloitte Touche, but that's not what she was on trial for. It's all part of the mix, isn't it? But it seems to me that my only point, really, and this gets to my second point, which is that I think what Price and the other cases say is that in a case like this, it is important to review the entire record to see whether the inferences are fair. It just isn't the case that you can say there's lots of evidence out there from which a jury could do this. I think in this particular case there was precious little evidence that she knew. There's no direct evidence that she knew, even though there's lots of evidence that her co-schemers, as it were, exculpated her. This is one of those cases, it seems to me, where it's really important to look at the record to see whether it's fair. That's what we've been doing. And we appreciate that. I've got a book full of it. Unblakely, I think our position is that she, the most that she could be sentenced to is six months under Blakely, under Amelie, and I think this court would, and the fact that we raise it in reply is accepted, I think. Okay. Thank you. Thank you both. We appreciate your arguments on both sides. The case is argued to be submitted, and we stand to recess. Thank you.
judges: Goodwin, Fisher, Tallman